UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LABEL HEALTH, LLC,

         Plaintiff,

    -v-

UNITED AMERICAN SUPPLY, LLC, DAVID UNDERWOOD, ARLETA TAYLOR, and AL TAYLOR,

         Defendants.

20 Civ. 5161 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

In this case, a broker of personal protective equipment ("PPE"), LABEL Health LLC ("Label"), alleges that a distributor of such products, United American Supply, LLC ("UAS"), and its members, David Underwood, Arleta Taylor,[1] and Al Taylor (collectively, "defendants" or "UAS"), fraudulently induced Label to contract to buy PPE and then breached that contract by failing to supply the PPE or issue Label a refund. Label brings claims for breach of contract and fraudulent inducement, claiming that, to induce Label to purchase PPE from them, defendants falsely depicted their relationships with their PPE supplier and manufacturer, and made false statements relating to the creation of an escrow account.

Defendants now move to dismiss Label's complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), and in the alternative, to dismiss its fraudulent inducement claims for failure to state a claim under Rule 12(b)(6). For the reasons below, the Court denies that motion in part and grants it in part.

---

[1] Label refers to Ms. Taylor as "Arletta" Taylor, but in a sworn declaration she submitted and in defendants' filings, her name is spelled "Arleta." *E.g.*, Dkt. 15. The Court uses the latter spelling, and will instruct the Clerk of Court to amend the caption of this case accordingly.

I.  **Background**

    A.  **Factual Background**[2]

        1.  **Parties**

Label, a New York LLC whose two members are each citizens of New York, is a broker formed in early 2020 to "sell PPE to large, institutional customers, including various government entities and private buyers," in light of the COVID-19 pandemic. Am. Compl. ¶¶ 1–2, 16.

UAS is a Kentucky LLC and PPE distributor. *Id.* ¶¶ 3, 12. David Underwood ("Underwood"), Arleta Taylor, and Al Taylor are United's members. *Id.* ¶¶ 4–6. All are Kentucky citizens. *Id.*

        2.  **Label's Dealings with UAS**

            a.  *The Parties' Transactions*

Between May and June 2020, Label contracted to sell its customers about $6.5 million worth of PPE—specifically, disposable nitrile gloves. *Id.* ¶ 11.

On May 22, 2020, Label contacted defendants to discuss UAS providing Label with PPE that Label would use to fulfill those orders. *Id.* ¶¶ 12, 18. During their discussions, Underwood assured Label that UAS had a 25-year relationship with the purported PPE manufacturer, McKesson, and that UAS knew that McKesson could handle the necessary volume of PPE. *Id.* ¶¶ 23–24, 29.

---

[2] The Court draws its account of the underlying facts from the Amended Complaint, Dkt. 23 ("Am. Compl."). On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers the Confidentiality Agreement, Am. Compl., Ex. A ("Conf. Agreement"), which was attached to the Amended Complaint, and therefore may be considered in deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). Further, insofar as defendants also move to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court, in considering that aspect of their motion, may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still "resolving all doubts in [plaintiff's] favor." *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

Underwood and Arleta Taylor also assured Label that its 50% deposit would be held in escrow pending delivery.  *Id.* ¶ 20.

On May 22, 2020, Label submitted its first order for 24.15 million nitrile gloves, for about $2.25 million, which Arleta Taylor confirmed.  *Id.* ¶¶ 26–27.  On May 23, 2020, Underwood sent Label a text message including the item and manufacturer number for the order, and assured Label that "all contracts with McKesson are signed and delivered."  *Id.* ¶ 29.  He also assured Label that the order "was already in the production [queue]."  *Id.*  The same day, Arleta Taylor sent Label a draft Escrow Agreement.  *Id.* ¶ 34.

On May 26, 2020, Label contacted Al Taylor with "last minute concerns and anxiety about UAS, which was a new supplier for" Label.  *Id.* ¶ 24.  In response, Al Taylor "assured [Label] that [UAS] would be able to handle [Label's] orders and specifically referenced their longstanding relationship with the manufacturer as a factor."  *Id.*  Label alleges that it relied on that representation in continuing to do business with UAS.  *Id.* ¶ 25 ("Based largely on these representations, [Label] decided to do business with [UAS].").

Soon after (the Amended Complaint does not specify a date), Underwood disclosed to Label that UAS did not actually have a relationship with McKesson, and that it instead was using a broker, non-party Diem Nguyen ("Nguyen"), with whom he claimed UAS *did* have a 25-year relationship.  *Id.* ¶ 31.  Based on that longstanding relationship, Underwood represented that he could "vouch for Nguyen's reputation as a broker and her ability to successfully procure gloves."  *Id.*

Also on May 26, 2020, Arleta Taylor sent Label confirmed sales orders, which stated the price and quantity of Label's PPE purchases to date.  *Id.* ¶ 35.  The same day, Label sent UAS a Confidentiality Agreement.  *Id.* ¶ 36; *see* Conf. Agreement.  That Agreement contained the following forum-selection clause:

3

> In the event of a lawsuit between us that in any way relates to the Transaction, our confidential information, or this agreement . . . you agree that the state or federal courts in the County of New York, New York will have exclusive jurisdiction.

Conf. Agreement § 10. The Agreement, in turn, defines "Transaction" to mean the "sale, manufacturing, and/or distribution of personal protective equipment." *Id.* § 2. David Miller signed the agreement on behalf of Label. Underwood signed for UAS. *Id.* at 4.

On May 27, 2020, Label sent defendants an email memorializing the terms of the transaction—including the amount of nitrile gloves, price, and delivery date—and stating that Label would pay 50% of the $2.25 million purchase price into escrow that day, with the remaining amount to be paid into escrow upon delivery. Am. Compl. ¶ 38. Delivery was guaranteed to be made on May 29, 2020. *Id.* Al Taylor replied, "[f]or now I agree to this." *Id.* ¶¶ 38–39. The same day, Label sent UAS a revised purchase order and escrow agreement, the latter of which UAS signed on June 1, 2020. *Id.* ¶¶ 40, 42.

Between May 28 and June 12, 2020, Label ordered additional PPE worth roughly $4.29 million (for a total of about $6.54 million). *Id.* ¶¶ 41, 44, 47. Between May 26 and June 2, 2020, Label wired $2.37 million to UAS, reflecting 50% of the purchase price up to that point. *Id.* ¶ 46. On June 12, 2020, Label submitted its last order, but UAS did not require it to wire any additional funds. *Id.* ¶ 47.

As of June 12, 2020, Label had thus ordered $6.54 million worth of PPE, and had paid UAS $2.37 million.

### b. The Collapse of the Deal

UAS, however, never delivered any PPE. On June 19, 2020, after the PPE failed to materialize, Label asked for a status update. Defendants, allegedly falsely, replied that the shipment had been sent from South Africa to Mexico, where it was being held. *Id.* ¶¶ 48–52.

By June 21, 2020, it became clear that defendants had not created an escrow account, *id.* ¶ 43, and that Nguyen, the broker with whom UAS had represented it had a 25-year relationship, had been scammed by "the South African manufacturer,"[3] who had absconded with the money, *id.* ¶ 53. As late as June 24, 2020, Underwood insisted he had a longstanding relationship with Nguyen, but at some point later admitted that he "barely knew" her. *Id.* ¶¶ 32, 59.

On June 22, 2020, a day after Label demanded a refund, UAS returned $994,406, leaving a remaining balance of $1.38 million. *Id.* ¶ 57. Label was also able to recover $200,000 directly from Nguyen. *Id.* ¶ 62. Later, UAS returned another $100,000 to Label. *Id.* ¶ 63. Since then, UAS has repeatedly assured Label that it will repay the balance when "some big business deal" comes through or Nguyen refunds them the money. *Id.* ¶¶ 60, 64–65. But, Label alleges, as of the time it filed the Amended Complaint, UAS still owed it $1,075,094.50. *Id.* ¶ 63.

### 3.     Label's Amended Complaint

Label's Amended Complaint brings three counts. Count One, for breach of contract, alleges that UAS breached the following contracts with Label: (1) the purchase orders; (2) the May 27, 2020 email; and (3) the Escrow Agreement. *Id.* ¶¶ 38, 72–80. Count Two alleges that UAS, Underwood, and Al Taylor committed fraud in the inducement by knowingly making false statements regarding their relationship with the manufacturer and Nguyen, upon which Label justifiably relied to its detriment. *Id.* ¶¶ 81–89. Count Three alleges that UAS and Arleta Taylor committed fraud in the inducement by knowingly making false statements about the creation of an escrow account. *Id.* ¶¶ 90–97. In its opposition, however, Label admits that its claim relating to the escrow agreement is "not viable."[4] Dkt. 32 ("Pl. Mem.") at 11 n.29.

---

[3] The Amended Complaint does not identify this manufacturer.

[4] Label states that it seeks leave to file a second amended complaint, to add a conversion claim. Pl. Mem. at 11 n.29. The Court does not grant leave to so file at this time. *See* Rule 15(a)(2).

5

### B.     Procedural History

On July 6, 2020, Label filed a Complaint. Dkt. 1. On October 5, 2020, after two extensions, UAS filed a motion to dismiss for lack of jurisdiction and failure to state a claim, Dkt. 11; a memorandum in support, Dkt. 12 ("Def. Mem."); the affirmation of David B. Morgen, Esq., Dkt. 13 ("Morgen Decl."), and attached exhibits; and the declarations of defendants Al Taylor, Arleta Taylor, and Underwood, Dkts. 14 ("Al Taylor Decl."), 15 ("Arleta Taylor Decl."), 16 ("Underwood Decl."). On November 9, 2020, Label filed the Amended Complaint. Am. Compl. On November 30, 2020, defendants filed a letter stating that "the allegations of the amended complaint remain insufficient" to maintain Label's lawsuit, and that defendants "rely upon their previously filed motion to dismiss . . . in response to the amended complaint." Dkt. 24 ("Def. Ltr."). On December 18, 2020, Label filed a memorandum of law in opposition to defendants' motion to dismiss. Pl. Mem. On January 6, 2021, UAS replied. Dkt. 36 ("Def. Reply").

## II.    Discussion

UAS has moved to dismiss Label's claims under both Rule 12(b)(2), for lack of personal jurisdiction, and Rule 12(b)(6), for failure to state a claim for fraudulent inducement. The Court considers the jurisdictional challenge first, and then turns to the merits of Label's claims.

### A.     Rule 12(b)(2): Lack of Personal Jurisdiction

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano*, 286 F.3d at 84 (citation omitted); *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt,*

6

*S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* at 84–85.

"This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (citation omitted); *see A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). Nevertheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted).

In determining whether there is personal jurisdiction, the Court must first decide whether the personal jurisdiction over a plaintiff's claims is supplied by a forum selection clause. If so, the analysis ends there, and there is no need to consider whether the Court would have jurisdiction under CPLR § 302 and the Due Process Clause. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements."); *Exp.-Imp. Bank of the U.S. v. Hi-Films S.A. de C.V.*, No. 09 Civ. 3573 (PGG), 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010) ("Where an

agreement contains a valid and enforceable forum selection clause, however, it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process."); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997) ("It is well-settled that jurisdiction by consent satisfies constitutional principles of due process." (citation omitted)), *aff'd sub. nom. Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115 (2d Cir. 1998).

To the extent that the forum-selection clause does not supply personal jurisdiction over a particular claim or claims, the Court inquires whether there is personal jurisdiction over the defendant under principles of New York law, based either on general jurisdiction, *see* N.Y. Civil Practice Law and Rules ("CPLR") § 301, or specific jurisdiction, *see* CPLR § 302. If jurisdiction is found on either ground, the Court then inquires whether "an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005). *See generally Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985).

Here, UAS argues that the Court should dismiss the Amended Complaint for lack of personal jurisdiction under New York's long-arm statute, CPLR § 302, and under the Due Process Clause. In support, it notes that the PPE at issue was supposed to be delivered to buyers in states other than New York, that UAS does not have contacts with New York beyond its communications with Label, and that it cannot be considered to have done business in New York sufficient to subject it to personal jurisdiction in New York. Def. Mem. at 4–12. Label responds that the Court has personal jurisdiction over defendants both as a result of UAS's dealings with Label, a New York LLC, and pursuant to the forum-selection clause in the Confidentiality Agreement. Pl. Mem. at 6–9.

Although there is a substantial question whether personal jurisdiction would exist based solely on defendants' contacts with New York State, the Court does not have occasion to reach that issue, because the forum-selection clause in the Confidentiality Agreement authorizes the exercise of jurisdiction over defendants.

Where a forum-selection clause (1) was "reasonably communicated to the resisting party"; (2) "is mandatory"; and (3) "encompasses the claims and parties at issue," there is a presumption that such a clause is valid and enforceable. *Martinez v. Bloomberg LP*, 740 F.3d 211, 227 (2d Cir. 2014). That presumption can then only be overcome by a showing that enforcement of the clause would be "unreasonable or unjust." *Id.* (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)).

The forum-selection clause in the Confidentiality Agreement is mandatory, as it provides for "exclusive jurisdiction" in New York. *See* Conf. Agreement § 10; *see Phillips*, 494 F.3d at 386 ("A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum . . . ."). And UAS does not argue that its terms were not "reasonably communicated" to UAS or the other defendants.[5] Rather, UAS argues that the forum-selection clause in the Confidentiality Agreement does not cover the "claims and parties at issue," because this lawsuit arises out of the purchase orders, not the Confidentiality Agreement, and because the agreements do not state that the forum-selection clause in the Confidentiality Agreement covers disputes arising from asserted breaches of the purchase orders. Def. Reply at 2–5; Def. Ltr.

---

[5] Generally, even non-signatories to a forum-selection clause, such as the Taylors here, may be bound by that clause where they are "closely related" to the signatory. *Magi XXI, Inc. v. Stato Della Citta del Vaticano*, 714 F.3d 714, 723–24 (2d Cir. 2013). Here, Underwood signed the Confidentiality Agreement on behalf of UAS, of which the Taylors are members. *See* Am. Compl. ¶¶ 5–6 (Arleta Taylor is Vice President of Administration for UAS and Al Taylor is its Managing Partner). Accordingly, all defendants are bound by the Confidentiality Agreement.

UAS, however, is incorrect that the forum-selection clause applies only to disputes concerning the Confidentiality Agreement. By its terms, the Agreement provides for exclusive jurisdiction in New York for any "lawsuit between us that in any way relates to the *Transaction*, our confidential information *or* this agreement," Conf. Agreement § 10 (emphasis added). The disjunctive use of the word "or" makes clear that the clause applies to disputes beyond those arising from "this agreement" and the parties' "confidential information," so as also to include those that "in any way relate[]" to the separate "Transaction." And it defines "Transaction" to mean the "sale, manufacturing, and/or distribution of personal protective equipment." *Id.* § 2. All of Label's claims here "relate[] . . . to" the "sale, manufacturing, and/or distribution of personal protective equipment," *i.e.*, UAS's statements inducing Label to buy such equipment from it, and UAS's failure to provide the bargained-for equipment. Accordingly, the clause squarely applies to those claims.

Given the breadth of the clause at issue, and its specific application to the parties' contemplated "Transaction," it is of no moment whether, as UAS argues, the parties' disparate contracts are considered "one agreement" or incorporate one another by name. *See* Def. Reply at 2, 4–5. Defendants do not identify any authority holding that forum-selection clauses like the one here are only enforceable in such circumstances. In fact, *Ainsley Skin Care of N.Y., Inc. v. Elizabeth Grady Face First, Inc.*, No. 97 Civ. 6716 (LAP) (AJP), 1997 WL 742526 (S.D.N.Y. Dec. 2, 1997), on which UAS relies, expressly left open whether the broad language in an agreement's forum-selection clause—which applied "to any dispute arising hereunder or in connection with the transactions contemplated hereby"—could apply to a separate agreement that lacked such a clause, *id.* at *3 n.2. Here, for the reasons above, the forum-selection clause is textually broad enough to cover disputes over the purchase orders at issue. Indeed it appears

expressly aimed at so applying. And UAS has not argued that enforcement of that clause would be "unreasonable or unjust." *See Martinez*, 740 F.3d at 227 (identifying relevant factors. The exercise of personal jurisdiction is therefore appropriate.

### B. Rule 12(b)(6): Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

To state a claim for fraudulent inducement under New York law, a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey*, 374 F. App'x 92, 94 (2d Cir. 2010) (citation omitted); *see Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009).[6]

---

[6] The parties' briefs treat New York law as governing this case, as does the Court. *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

UAS argues that Count Two, claiming fraud in the inducement, should be dismissed for failure to state a claim. It contends that (1) any purported misstatements were merely non-actionable "puffery"; (2) the Amended Complaint does not plausibly allege that any defendant's statements as to their relationship with the PPE manufacturer and broker were material; and (3) the Amended Complaint does not plausibly plead that Label justifiably relied on those statements, given the "enhanced duties" of due diligence expected of sophisticated parties. Def. Reply at 7–9 (citing *Integrated Constr. Enters., Inc. v. GN Erectors, Inc.*, No. 16 Civ. 5561 (PAE), 2020 WL 614991 (S.D.N.Y. Feb. 10, 2020); *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 455 (S.D.N.Y. 2016)).[7]

### 1.   Puffery

Defendants' allegedly false statements about their relationship with Nguyen and the manufacturer cannot be dismissed as puffery as a matter of law. The Second Circuit has defined non-actionable puffery as "[s]ubjective claims about products, which cannot be proven either true or false." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) (citation omitted). "Courts have found statements to be puffery as a matter of law when the statements do not provide any concrete representations." *Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*, No. 04 Civ. 1369 (GEL), 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005). Here, however, Label's central claim turns on objective representations that the defendants allegedly made to Label, to the effect that they had a 25-year relationship with the manufacturer and Nguyen. Am. Compl. ¶¶ 23–24, 31. These claims are concrete, and their truth or falsity is capable of being determined. Indeed, the

---

[7] Defendants also move to dismiss Count Three, a fraudulent inducement claim against UAS and Arleta Taylor, arguing that such claim is duplicative of Label's breach-of-contract claim. Def. Mem. at 15–16. Label concedes that this claim is not viable. Pl. Mem. at 11 n.29. Accordingly, the Court dismisses it.

Amended Complaint alleges that defendants later admitted that these representations were false. *Id.* ¶¶ 31–32. These allegedly false statements are actionable. They are not puffery.

### 2. Materiality

The Amended Complaint also adequately pleads that defendants' false statements were material to Label's decisions to buy PPE from UAS. "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999). On a motion to dismiss, "[a] fact may not be dismissed as immaterial unless it is 'so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance.'" *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). "Materiality is typically a fact question." *Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 15 Civ. 4428 (ALC), 2018 WL 4278286, at *23 (S.D.N.Y. Mar. 26, 2018) (denying motion for summary judgment on basis of immateriality).

Here, the Amended Complaint alleges that, before placing orders with UAS, Label "expressed last minute concerns and anxiety about UAS, which was a new supplier for Plaintiff, being able to successfully satisfy such a large order of PPE. Mr. Taylor assured Plaintiff that Defendants would be able to handle Plaintiff's orders *and specifically referenced their longstanding relationship with the manufacturer as a factor*." Am. Compl. ¶ 24 (emphasis added). Label further alleges that "[h]ad [Label] known that Defendants' relationship with Nguyen . . . was so short, in contradiction of what had been represented to it, [Label] would have, at a minimum, sought additional information and guarantees from Defendants and would not have put in any further orders." *Id.* ¶ 33.

13

In a transaction aimed at timely securing a large amount of medical equipment for the purchaser's customers, the seller's assurances as to its experience with the manufacturer, and that manufacturer's ability to fulfill the order, as pled, were clearly material. These representations centrally bore on the seller's capacity to carry out its contractual duties. These representations were not "so obviously unimportant . . . that reasonable minds could not differ" on their importance to Label's business decisions. *Allen*, 945 F.2d at 45. Defendants state that these statements "would not lead a reasonable person to change his conduct," Def. Reply at 7, but that is an *ipse dixit*. Quite to the contrary, given the scale and time-sensitivity of the transaction, it is entirely plausible that defendants' purported long business history with the PPE suppliers would have been consequential to a reasonable entity in Label's position. The Amended Complaint plausibly pleads the materiality of these allegedly false statements.

### 3. Reasonable Reliance

UAS, finally, claims that Label fails to plead justifiable reliance, but that challenge to the pleadings also fails. At this early stage, Label's claim to have reasonably relied on UAS's false representations cannot be held implausible.

"[O]n a motion to dismiss, defendants can prevail only [in dismissing a claim for fraud] if it was categorically unreasonable for [Label] to rely on this representation." *Shively v. Mitchell*, No. 13 Civ. 2164 (PAE), 2013 WL 5761498, at *8 (S.D.N.Y. Oct. 24, 2013). "To determine, on a motion to dismiss, whether a plaintiff has alleged reasonable reliance, a court may 'consider the entire context of the transaction, including . . . the sophistication of the parties, and the content of any agreements between them.'" *Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)). Courts will also consider whether an allegedly defrauded plaintiff received "clear and direct signs of falsity," and whether they "had access to

14

relevant information." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 642–43 (S.D.N.Y. 2015) (quoting *Coraud LLC v. Kidville Franchise Co.*, 121 F. Supp. 387, 397 (S.D.N.Y. 2015)). This inquiry "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." *Maloul v. Berkowitz*, No. 07 Civ. 8525 (LBS), 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008). Even at the summary judgment stage, courts often hesitate to resolve issues of reasonable reliance, preferring to reserve the question for the finder of fact. *See, e.g.*, *De Sole*, 139 F. Supp. 3d at 643. On the pleadings, courts will dismiss a complaint's allegations on this point as inadequate only in circumstances that make such failures readily apparent, usually "where sophisticated plaintiffs easily could have discovered the fraud had they reviewed specific documents that were the subject of misrepresentations." *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 Civ. 3478 (DAB), 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006).

At the outset, UAS's supposition that Label is a "sophisticated" party, with consequently heightened investigatory obligations, does not follow from the Amended Complaint. The cases cited by UAS that impose such a heightened duty of due diligence involved large banks and hedge funds that had entered into complex, highly negotiated transactions. *See, e.g.*, *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) ("[W]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." (citation omitted)); *Negrete*, 187 F. Supp. 3d at 466 (noting that "[p]laintiffs were a sophisticated counterparty with access to vast amounts of information about the FX markets" and engaged in "billion dollar FX trading," all of which "contradict[ed] their claim of reliance").

15

Here, by contrast, the Amended Complaint and materials cognizable on the motion to dismiss do not suggest that the subject of the parties' negotiations was a complex or unusually technical product. They do not suggest that the PPE transaction was heavily lawyered on either side, or that, by nature, it required pre-signing regulatory review or preclearance. Nor do they indicate that unusual sophistication was otherwise expected of the parties. To the contrary, the agreement—based on the pleadings—appears to have been an informal, quickly arranged, and (save for the fact that Label's purchase arose from a once-in-a-century pandemic) relatively quotidian pact between an equipment purchaser and supplier. As pled, these circumstances would not give rise to a heightened due-diligence obligation.

To be sure, there are hints in the Amended Complaint that Label may have had cause to appreciate—before the extent of UAS's breach became fully apparent—that UAS had dissembled to it. "[S]hortly after" May 23, 2020, after Label had ordered about $2.2 million of PPE but possibly before it had sent the 50% deposit to UAS between May 26 and June 2, 2020, Underwood disclosed that UAS's longstanding relationship was not with the manufacturer, as he had previously stated, but with the broker, Nguyen. Am. Compl. ¶ 31. The pleadings do not indicate that Label followed up by probing UAS about its relationship with Nguyen, or that it otherwise undertook investigatory actions to assure itself of Nguyen's reliability. Instead, Label appears to have added to its orders and transmitted money to UAS without further inquiry. That could suggest that its reliance was unreasonable, or even undercut its claim that UAS's business relationships were, in fact, material to Label's decision-making. To the extent that UAS intends to defend against the claim of fraudulent inducement on the ground that it was unreasonable for Label to rely on UAS's word, this area may be a fruitful one for discovery.

16

However, on the limited materials cognizable at the pleading stage, the Court cannot determine that Label had a "duty to inquire" further than it did in May 2020, such that its failure to do so made its reliance unreasonable. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). The assembled case law makes clear that the existence of a duty, including based on the parties' sophistication, is "fact-intensive." *See, e.g.*, *id.* at 406–07 (quoting *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). Discovery is necessary to ascertain whether Label qualifies as a sophisticated party subject to heightened diligence duties, and whether, all facts considered, Label justifiably relied on UAS's representations at the relevant times.

Accordingly, the Court denies UAS's motion to dismiss the claim for fraudulent inducement against UAS, Al Taylor, and Underwood, without prejudice to UAS's right, after discovery, to move for summary judgment against this claim.

## CONCLUSION

For the foregoing reasons, the Court denies in part and grants in part defendants' motion to dismiss. The Court denies the motion to dismiss for lack of personal jurisdiction and to dismiss Count Two, alleging fraudulent inducement against UAS, Al Taylor, and Underwood. The Court, however, on consent, dismisses Count Three, alleging fraudulent inducement related to the Escrow Agreement against UAS and Arleta Taylor.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 11. The Clerk of Court is further directed to amend the caption of this case to reflect the spelling of defendant Arleta Taylor's name reflected in the caption above.

An order scheduling an initial pretrial conference in this case will issue soon.

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: February 17, 2021
       New York, New York